1   **WO**

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9   JEFFREY ADCOCK,                    )   No. CV 06-3116-PHX-MHM
                                        )
10              Plaintiff,              )   **ORDER**
                                        )
11  v.                                  )
                                        )
12                                      )
    MICHAEL J. ASTRUE,                  )
13  Commissioner of Social Security,    )
                                        )
14              Defendant.              )
                                        )
15  _____ )

16

17          Plaintiff Jeffrey Adcock ("Plaintiff") seeks judicial review the Administrative Law

18  Judge's decision to deny Plaintiff's claim for disability insurance benefits pursuant §§ 205(g)

19  and 1631 of the Social Security Act ("Act"), 42 U.S.C. §§ 405(g), 1383(c)(3).  Currently

20  before the Court are Plaintiff's motion for summary judgment pursuant to Rule 56(a) of the

21  Federal Rules of Civil Procedure ("FRCP") (Dkt. #23) and Defendant Michael Astrue's

22  ("Defendant") cross-motion for summary judgment pursuant to FRCP 56(b) (Dkt. #35).

23  **I.      PROCEDURAL HISTORY**

24          Plaintiff filed applications for Disability Insurance and Supplemental Security Income

25  benefits under Titles II, XVI, and XIX of the Social Security Act, 42 U.S.C. §§ 401 et seq.,

26  1381 et seq., 1396 et seq., on June 2, 2003.  (Administrative Record ("AR") 59-61, 598-599).

27  Plaintiff's applications were denied initially and on reconsideration.  (AR 32-36, 39-42, 601-

28  09).  On April 21, 2005, a hearing was held before Administrative Law Judge ("ALJ")

1   Michael Cianci, Jr.  (AR 648-75).  On June 21, 2005, the ALJ denied Plaintiff's application

2   for a period of disability and disability insurance benefits under section 216(I) and 223 of the

3   Social Security Act. (AR 16-22).  The Appeals Council denied Plaintiff's request for review

4   of the ALJ's decision on November 2, 2006 (AR 7-10), and on December 29, 2006, Plaintiff

5   initiated the instant action for judicial review of the ALJ's decision pursuant to 42 U.S.C. §§

6   405(g), 1383(c)(3).

7   **II.     BACKGROUND**

8        **A.     Plaintiff's Medical History**

9             **1.     Mental Health**

10        On May 11, 2001, Plaintiff sought emergency treatment for a panic attack and was

11   diagnosed with "acute anxiety." (AR 16, 134).  On June 1 and 16, 2001, Plaintiff was treated

12   for "Anxiety/Bipolar Depression," and on October 9, 2001, Plaintiff was diagnosed with

13   "Bipolar I Disorder, Most Recent Episode Depressed, Moderate; Cocaine Dependence, in

14   Full Sustained Remission by self-report" and "Diabetes type II and hypertension, by self-

15   report." (AR 172). Plaintiff's "prognosis for returning to the work force [was] good in terms

16   of cognitive functions such as attention, concentration and short term memory.  However,

17   his interpersonal skills are somewhat weak, owing chiefly to his lack of medications for his

18   mental disorder.  His ability to perform work-related tasks [was] good in terms of cognitive

19   functions." (AR 172).

20        On October 19, 2001, Plaintiff was treated for anxiety and depression, and was

21   referred to a psychiatrist. (AR 245).  On October 24-25, 2001, Plaintiff began receiving

22   psychiatric evaluations at Jewish Family and Children's Services ("JFCS") and sought

23   treatment through June 2003 for anxiety, depression, insomnia, and panic attacks with

24   agoraphobia, usually with social workers and nurses, but also with Dr. Michael Fermo.  (AR

25   303-79).  The Court finds it unnecessary to recount here all of Plaintiff's visits to JFCS as

26   indicated in the record, suffice to say that the records indicate that Plaintiff's diagnoses at

27   JFCS, as well as Plaintiff's other care providers, remained fairly constant, with diagnoses of

28   bipolar disorder, depression, panic attacks with agoraphobia, diabetes, high blood pressure,

an anxiety disorder, and hypertension.  (AR 350, 378).  JFCS's records indicate that Plaintiff's mood fluctuated between being "a little bummed" or depressed (AR 311) and "doing a little better" (AR 306) and "doing great" (AR 312).

Plaintiff's Global Assessment of Functioning ("GAF") scores ranged from between 50 (October 25, 2001) and 68 (August 15, 2002).[1]  (AR 378, 350).  In May and October 2002, January and July 2003, Plaintiff's treaters at JFCS, including Dr. Fermo, assessed Plaintiff as only "mildly" mentally ill.  (AR 338, 340-42, 345).  However, Plaintiff was also intermittently assessed as "moderately" mentally ill.  (AR 313, 344).  The assessment of Plaintiff's condition ranged from "unchanged" to "[g]ood improvement"; likewise, the assessment of Plaintiff's insight, judgment, and concentration ranged from poor to good. (AR 303, 309, 310, 313, 344, 358, 634).

On November 20, 2001, Dr. Paul Tangeman, a state agency reviewing psychologist, reviewed the record and found that Plaintiff had a bipolar disorder, no restriction of activities of daily living, difficulties in maintaining social functioning that were moderate, difficulties in maintaining concentration, persistence, or pace that were mild, and one or two episodes of decompensation of extended durations. (AR 173-186). Dr. Tangeman stated that Plaintiff was "angry [and] tends to isolate," but that there was nothing in Plaintiff's mental status examinations to "indicate any substantial impairments aside from [Plaintiff's] social problems" and that Plaintiff "retains the ability to perform basic work tasks [with] few socially stressful demands."  (AR 189).  In addition, on January 29, 2002, Dr. Ronald Nathan, another state agency reviewing doctor, reviewed the record and found that Plaintiff had a bipolar disorder that constituted a severe impairment, but was not expected to last 12

---

[1]A GAF is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Impairments, 4th text rev., 2000, p.32 (DSM-IV-TR).  A GAF score of 51-60 is indicative of moderate symptoms, such as flat affect or occasional panic attacks, or any moderate difficulty in social, occupational, or school functioning. (Id.).  A GAF score of 41-50 is indicative of serious symptoms, and a GAF score of 61-70 is indicative of mild symptoms. (Id.).

1    months.  (AR 191, 194).  Dr. Nathan also found that Plaintiff's only degree of limitation was
2    a mild limitation in maintaining social functioning.  (AR 201).

3    　　In December 2003, and at various times in 2004, Plaintiff was treated at Southwest
4    Behavioral Health Services.  (AR 458-507).  In March 2004, Dr. Raikhelkar noted that
5    Plaintiff "has done very well since he started to come to this clinic," and that Plaintiff was
6    applying for disability benefits.  (AR 464).  Plaintiff assessment at this time was "[b]ipolar
7    disorder with manic episodes, in remission now, without psychosis," "[p]ain syndrome,"
8    "[s]upport system issues and social issues and economic issues," and a GAF score of "[a]bout
9    55."  (AR 464).  In addition, in April 2004, Plaintiff began treatment at ValueOptions (AR
10   550-79), and on January 7, 2005, underwent an "Annual Behavioral Health Update and
11   Review Summary."  (AR 550).  Plaintiff's status was "normal attention span, memory is
12   intact, processing is normal and able to problem-solve"; "appropriate affect and mood. . . .
13   good judgement and [ ] emotionally stable."  (Id.).  The assessment stated that Plaintiff lived
14   alone in an apartment, that Plaintiff "has adequate self-preservation skills," and that "[o]n a
15   typical day, [Plaintiff] goes on the internet a lot and enjoys going on E-Bay.  He goes with
16   his aunt shopping everyday.  He forces himself to get out of the house and get busy so he
17   does not get depressed."  The assessment further stated that Plaintiff "expressed working
18   part-time as a data entry operator again as long as he can still keep his AHCCCS. [Plaintiff]
19   reports that he can type 70 wpm.  He is not able to sit for long period of time."  (AR 552).

20   **2.    Physical Health**

21   　　On February 26, 2002, Plaintiff was treated for neck pain and an upper respiratory
22   infection by a physician with CIGNA Medical Group.  (AR 239, 267).  Plaintiff received X-
23   rays of his cervical spine, and on February 26, 2002, Plaintiff's X-rays were reviewed and
24   showed "degenerative changes."  (AR 269).  On March 11, 2002, Plaintiff was assessed with
25   acute bronchitis, neck pain with a C-spine X-ray that revealed degenerative joint disease, and
26   fatigue; Plaintiff's medications were adjusted.  (AR 217).  On March 28, Plaintiff began
27   seeing Dr. John Mahon, for complaints of neck and upper left extremity pain; Dr. Mahon
28   noted that Plaintiff should try physiotherapy.  (AR 391-95).  Dr. Mahon noted that Plaintiff

1   was on a variety of medications, and that he did not want to add to those, but that he did

2   speak to Plaintiff about the possibility of epidural steroid injections. (Id.). Plaintiff asked

3   Dr. Mahon what kind of work he could do and Dr. Mahon opined that "he not have anything

4   that requires him to gaze upwards. Data entry at a computer is a possibility as long as

5   [Plaintiff] changes positions frequently and has a monitor placed directly in front of him

6   rather than to the side." (Id.).

7         On May 9, 2002, Dr. Mahon noted Plaintiff stated that his physiotherapy had "been

8   very beneficial" and provided him "at least 4 to 6 hours of relief" (AR 393), but on October

9   30, 2002, Plaintiff reported low back and bilateral leg pain, and Dr. Mahon's impression was

10  "bilateral sciatic irritation" and recommended an MRI. (AR 391). Dr. Mahon also noted that

11  Plaintiff asked for "stronger pain medicine," but Dr. Mahon did "not want to give him other

12  medications that [were] going to interfere in any way with his bipolar meds." (AR 392). On

13  November 7, 2002, Plaintiff underwent an MRI of his lumbar spine, and the resulting

14  "impression" was "[m]ultilevel degenerative disc disease of the lumbar spine," and

15  "[m]ultilevel ligamentum flavum and facet hypertrophy with multilevel neural foraminal

16  narrowing and probable neural impingement." (AR 211-13). After reviewing Plaintiff's

17  MRI, Dr. Mahon recommended epidural steroid injections, Valium, a formal physical therapy

18  program, and a weight reduction program. (AR 386-88). On November 25, 2002, Dr.

19  Mahon indicated that Plaintiff's following limitations included "[m]aximum lifting 20

20  pounds intermittently," "[a]voidance of bending, stooping, or squatting," "[r]est periods of

21  10 minutes every two hours," and "[m]aximum work day of eight hours with four hours

22  interrupted by one hour." (AR 209). From December 2002 to March 2003, Plaintiff received

23  three epidural injections, and in April 2003, Plaintiff was referred back to pain management.

24  (AR 222, 260, 262-63).

25        On April 22, 2003, Dr. Glen Bair, an orthopedic surgeon, examined Plaintiff at the

26  request of Dr. Mahon, and noted that although Plaintiff's "range of motion is moderately

27  decreased," Plaintiff's neurologic exam was "not remarkable." (AR 385). Dr. Bair assessed

28  Plaintiff with "chronic back pain," and noted that Plaintiff "apparently is on multiple

1    medications for bipolar mood disorder.  He smokes a pack of cigarettes a day." (Id.).  Dr.

2    Bair recommended a lumbar CT scan, which revealed primarily "minimal" disc bulges, the

3    most pronounced of which was at the L1-L2 level, "which flattents the ventral aspect of the

4    thecal sac."  (AR 386).  The impression was "[l]umbar spine degenerative disc disease

5    changes." (AR 387).  On May 9, 2003, Plaintiff saw Dr. Bair again, and Dr. Bair noted that

6    Plaintiff "continues with low back pain"; Dr. Bair recommended that Plaintiff try a back

7    brace.  (AR 382).

8         On May 21, 2003, Plaintiff was seen by Dr. William Stevens for spine surgery

9    consultation on referral by Dr. Drew Peterson, Plaintiff's treating physician at CIGNA

10   Medical Group.  (AR 214).  Plaintiff's "[p]hysical examination [found] a somewhat

11   deconditioned male.  His affect is appropriate."  (AR 215).  Dr. Stevens's recommended

12   "[l]umbar physical therapy strengthening and stabilization" and "referral to a pain

13   management specialist."  Dr. Stevens also "dsicussed the importance of weight loss" and

14   "advised [Plaintiff] to discontinue tobacco use."  (AR 216).

15        On October 6, 2003, Dr. Peterson completed a "Medical Assessment of Ability to Do

16   Work Related Physical Activities" checklist and indicated that Plaintiff had degenerative disc

17   disease with chronic low back pain, neck pain, and "some difficult [sic] to control

18   depression."  (AR 420-23).  Dr. Peterson checked off that Plaintiff could only sit (due to

19   back), lift (due to back), stand (due to back), carry, and walk (continuously) for less than one

20   hour each in an eight-hour workday. (Id.).  Dr. Peterson indicated that Plaintiff was limited

21   by his pain and fatigue, which "moderately severe[ly]" limited Plaintiff's ability to function.

22   (AR 422).  Dr. Peterson noted that his findings regarding Plaintiff's limitations were based

23   on "MRI."  (Id.).

24        Starting on January 5, 2004, Plaintiff was treated at the Scottsdale Center for

25   Advanced Pain Management.  (AR 510-38).  The attending physician noted that Plaintiff was

26   "an excellent candidate for interventional pain management."  (AR 534-38).  Plaintiff stated

27   his average pain level was "4-5/10" but is sometimes "8/10."  (AR 531).  On April 12, 2004,

28   Plaintiff "seem[ed] to have mostly signs and symptoms of lumbar facet disease," "his pain

1    has improved," and he "seem[ed] to be doing reasoanbly well." (AR 526-27).  On October

2    26, 2004, the attending physician noted that Plaintiff "seems to be relatively stable," but that

3    he "states that his average pain level with medication is 3-4/10 when he is hanging out

4    around the house.  However, when he is going out to thrift shops and junk shops, which is

5    his favorite pastime, his pain increases markedly and he cannot spend more than an hour or

6    two out at a time. . . . Prolonged standing and walking worsens his pain a lot." (AR 516).

7              **B.    Hearing Testimony**

8              On April 21, 2005, a hearing on Plaintiff's application for disability benefits was held

9    before the ALJ. (AR 649-75).  Plaintiff and David Janus, a vocational expert, gave testimony

10   at that hearing.  (Id.).  Plaintiff, age 43 at the time of the hearing, testified that he had a high

11   school education and that his past work experience involved clerical data entry ("clerical

12   jobs, data entry jobs, and temporary jobs.  I have been trough a lot of jobs."). (AR 655-56).

13   Plaintiff testified that he stopped working in May 2001 due to "[p]anic attacks, and a lot of

14   stress, mood swings," and that he had physical problems of degenerative disc disease and

15   chronic pain.  (AR 655-56).  Plaintiff stated that he could only stand for thirty to forty-five

16   minutes before his pain forced him to sit down, and vice versa, he could only sit for that long

17   before he had to get up or lie down.  (AR 656-57).  In addition, Plaintiff stated that he could

18   only walk for "about a half hour" before he had to stop and rest.  (AR 657).  Further, Plaintiff

19   stated that he normally took a nap for "several hours" around 1:00 or 2:00 p.m., and that he

20   had problems sleeping at night and could sometimes "be up for one or two days with no

21   sleep." (AR 658).  Plaintiff testified that the medication he was taking for his bipolar

22   disorder "tend[ed] to work." (AR 664).

23             The vocational expert was posed several hypotheticals by the ALJ, specifically

24   whether an individual of Plaintiff's age, work experience, and educational background, that

25   could lift no more than 20 pounds occasionally, ten pounds frequently; that could only sit,

26   stand and/or walk six hours out of an eight hour day; that could not climb ladders, ropes, or

27   scaffolds, and only occasionally stairs and ramps; that had to avoid bending, crouching,

28   crawling, kneeling, as well as the cold, vibrations, and hazardous conditions; and that had to

1   avoid confrontational roles, which would preclude work that would be of a supervisory

2   nature, and things like arbitration and negotiation, could perform the past relevant work

3   either as he or she did, or as performed in the national economy.  (AR 668-69).  The

4   vocational expert answered affirmative to both in terms of Plaintiff's past relevant work

5   experience as a data entry clerk and receptionist, and as to those jobs as performed in the

6   national economy.  (AR 669).  The vocational expert also testified that no work was available

7   for a hypothetical individual that could only sit, stand, and walk for one hour each for an

8   eight hour day; he stated that such a limitation would preclude work as a general office clerk

9   or receptionist, or any similar work, because it would preclude the individual from

10  maintaining full-time work.  (AR 673-74).

11       **C.   ALJ's Conclusion**

12       On June 21, 2005, the ALJ denied Plaintiff's claim for disability insurance benefits,

13  following the requisite five-step sequential evaluation for determining whether an applicant

14  is disabled under the Social Security Act.  See 20 CFR §§ 404.1520 and 416.920.  (AR 16-

15  22).  At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful

16  activity since May 11, 2001.  (AR 17).  At step two, the ALJ stated that the objective medical

17  evidence of the record indicated that Plaintiff had a "back disorder, left carpal tunnel

18  syndrome, stable with recent surgery, hypertension, stable, a history of substance abuse

19  disorder, reportedly in remission, and an affective disorder resulting in mild restriction of his

20  activities of daily living, moderate difficulties maintaining social functioning, mild

21  difficulties maintaining concentration, persistence, and pace, and one or two episodes of

22  decompensation, each of an extended duration, as a result of his mental impairment."  (Id.).

23  The ALJ concluded that these impairments were severe; however, at step three, the ALJ

24  found that these impairments did not meet or equal, either singularly or in combination, the

25  criteria of any listed impairment pursuant to Appendix 1 of the Regulations, 20 CFR, Part

26  404, Subpart P, Appendix 1.  (Id).

27       At step four, the ALJ, considering "all symptoms, including pain, and the extent to

28  which these symptoms can reasonably be accepted as consistent with the objective medical

1   evidence," concluded that Plaintiff retained the residual functional capacity "for a wide range

2   of light work activity.  He can lift and carry ten pounds frequently and twenty pounds

3   occasionally, sit, stand and walk for six hours a day each, use the left upper extremity

4   frequently for handling and constantly use the right upper extremity in that regard,

5   occasionally bend, crouch, crawl, and kneel, and occasionally climb ramps and stairs.  He

6   cannot climb ladders, ropes, or scaffolds, and he must avoid cold temperatures, vibration, and

7   hazardous heights and moving machinery.  He must also avoid confrontational roles." (AR

8   18).

9       In making this determination, the ALJ gave "great weight" to the assessment of

10  Plaintiff's treating physician, Dr. Mahon, that Plaintiff had the following limitations:

11  "maximum lifting of 20 pounds intermittently, avoiding bending, stooping, or squatting, rest

12  periods of 10 minutes every two hours, and maximum work day of eight hours with four

13  hours interrupted by one hour." (AR 20).  The ALJ stated that "[t]hat opinion was given

14  probative weight in this decision based on Dr. Mahon's treating relationship with [Plaintiff],

15  his respective medical specialty, and his consistency with the greater objective record." (Id.).

16  The ALJ also gave probative weight the opinions of the State agency's reviewing physicians

17  because of their "consistency with the greater objective record." (Id.).  However, the ALJ

18  rejected the checklist assessment of Plaintiff's treating physician, Dr. Peterson, which

19  "opined that due to back pain, [Plaintiff] could sit, stand and walk for less than 1 hour each

20  in an 8-hour day . . ." and that Plaintiff was "limited by pain and fatigue to a moderately

21  severe degree," because "it [was] inconsistent with the greater objective record, particularly

22  with respect to the opinion of Dr. Mahon" and appeared to be "motivated by a desire to help

23  get the claimant benefits." (Id.).

24      In addition, the ALJ rejected Plaintiff's "allegations that he is severely limited

25  physically" by his pain because Plaintiff "lives independently in an apartment, drives, shops,

26  and prepares his own meals.  He also does his laundry at his parents' house.  He said that

27  sometimes he goes to the thrift store every day with his aunt, and that he walks to the mall

28  for exercise.  Although he prefers to say at home, [Plaintiff] makes himself get out and be

1   active in order to help control his diabetes.  He has a friend that he sees regularly." (AR 19).

2   The ALJ concluded that Plaintiff's subjective complaints were exaggerated and did not

3   warrant any additional limitations beyond those established in his previously determined

4   residual functional capacity evaluation.  (AR 20-21).  Thus, based on the ALJ's findings

5   regarding Plaintiff's residual functional capacity, and the testimony of the vocational expert,

6   the ALJ concluded that Plaintiff could perform his past relevant work as a receptionist or data

7   entry clerk.  (AR 21).

8   **III.   STANDARD OF REVIEW**

9           The Court must affirm an ALJ's findings of fact if they are supported by substantial

10  evidence and free from reversible legal error.  See 42 U.S.C. 405(g); see also Marcia v.

11  Sullivan, 900 F.2d 172, 174 (9th Cir. 1990).  Substantial evidence means "more than a mere

12  scintilla," but less than a preponderance, i.e., "such relevant evidence as a reasonable mind

13  might accept as adequate to support a conclusion." See, e.g., Richardson v. Perales, 402 U.S.

14  389, 401 (1971); Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975); Clem

15  v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990).

16          In determining whether substantial evidence supports a decision, the record as a whole

17  must be considered, weighing both the evidence that supports and the evidence that detracts

18  from the ALJ's conclusion.  See Richardson, 402 U.S. at 401; see also Tylitzki v. Shalala,

19  999 F.2d 1411, 1413 (9th Cir. 1993).  "It is for the ALJ, not the courts, to resolve ambiguities

20  and conflicts in the medical testimony and evidence." Andrews v. Shalala, 53 F.3d 1035,

21  1039 (9th Cir. 1995) (citations and quotations omitted).  The ALJ may draw inferences

22  logically flowing from the evidence, and "[w]here evidence is susceptible to more than one

23  rational interpretation, it is the ALJ's conclusion which must be upheld." Id. (citation

24  omitted).  "If the evidence can support either affirming or reversing the ALJ's conclusion,

25  [the Court] may not substitute [its] judgment for that of the ALJ." Robbins v. Social Sec.

26  Admin., 466 F.3d 880, 882 (9th Cir. 2006).

27          In order to qualify for disability insurance benefits, a plaintiff must establish that he

28  is unable to engage in substantial gainful activity due to a medically determinable physical

1  or mental impairment that has lasted or can be expected to last for a continuous period of not

2  less than 12 months.  See 42 U.S.C. § 1382c (a)(3)(A).  A plaintiff must show that he has a

3  physical or mental impairment of such severity that he is not only unable to do her previous

4  work, but cannot, considering his age, education, and work experience, engage in any other

5  kind of substantial gainful work which exists in the national economy.  Quang Van Han v.

6  Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989).  To determine whether an applicant is eligible

7  for disability benefits, the ALJ conducts the following five-step sequential analysis:

> (1)   determine whether the applicant is currently employed in substantial gainful activity;
> (2)   determine whether the applicant has a medically severe impairment or combination of impairments;
> (3)   determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;
> (4)   if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;
> (5)   if not, determine whether the applicant is able to perform other work that exists in substantial numbers in the national economy.

15  20 CFR §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987).

16  **IV.   DISCUSSION**

17       Plaintiff contends that the ALJ (1) erred in rejecting the opinion of one of Plaintiff's

18  treating physicians, Dr. Peterson; (2) erred in assessing Plaintiff's credibility as to the

19  severity of his pain and symptoms; and (3) erred in posing an improper hypothetical to the

20  vocational expert.

21       **A.   The ALJ's Consideration of Dr. Mahon's Opinions and Rejection of Dr. Peterson's Checklist Assessment**

22       Plaintiff argues that although the ALJ properly gave probative weight to the

23  November 2002 opinion of Dr. Mahon, one of Plaintiff's treating physicians, the ALJ's

24  residual functional capacity assessment was improper because it did not include the

25  limitations that Dr. Mahon mentioned, including an avoidance of bending, stooping, or

26  squatting, rest periods of ten minutes every two hours, and a one hour break after four hours

27  of work. (Dkt. #25, p.6).  In addition, Plaintiff argues that the ALJ improperly rejected the

28

1    October 2003 checklist assessment of Dr. Peterson, another one of Plaintiff's treating

2    physicians, that Plaintiff could not perform more than three hours of work in an total eight

3    hour workday because the ALJ failed to provide the requisite clear and convincing or even

4    specific and legitimate reasons for rejecting Dr. Peterson's opinion.  Defendant, on the other

5    hand, contends that the ALJ adequately considered the evidence in the record as a whole and

6    properly gave probative weight to the opinion of Dr. Mahon while rejecting the controverted

7    findings of Dr. Peterson.

8         There are three types of physicians: treating physicians, physicians who examine but

9    do not treat the claimant ("examining physicians") and those who neither examine nor treat

10    the claimant ("nonexamining physicians").  Lester v. Chater, 81 F.3d 821, 830 (9th Cir.

11    1996).  "If a treating physician's medical opinion is supported by medically acceptable

12    diagnostic techniques and is not inconsistent with other substantial evidence in the record,

13    the treating physician's opinion is given controlling weight."  Holohan v. Massanari, 246

14    F.3d 1195, 1202 (9th Cir. 2000) (citations omitted).  However, a consultative examiner's

15    opinion may constitute substantial evidence.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149

16    (9th Cir. 2001).

17         The ALJ may disregard a treating physician's opinion when his or her opinion is not

18    supported by the medical record or there is conflicting medical evidence.  See, e.g., Flaten

19    v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1463-1464 (9th Cir. 1995); Magallenes

20    v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) ("A lack of supporting clinical findings is a

21    valid reason for rejecting a treating physician's opinion.").  The ALJ may also disregard a

22    treating physician's opinion if it is brief and conclusory with little clinical findings to support

23    its conclusion.  See Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986).  "A check-box

24    form that does not contain an explanation of the bases for the conclusions made is entitled

25    to little weight."  Boller v. Astrue, 2008 WL 268970, at *8 (E.D.Cal. 2008) (citing Crane v.

26    Shalala, 76 F.3d 251, 253 (9th Cir. 1996)).  However, "vague, broad, or generalized reasons

27    are insufficient grounds for the ALJ to reject a treating physician's opinion."  Id. (citing

28    McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989)).  If the ALJ is presented with

1    conflicting medical opinions, the ALJ must determine credibility and resolve the conflict.

2    Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).   However, in rejecting a

3    contradictory treating physician's opinion, the ALJ must provide "specific and legitimate

4    reasons" supported by substantial evidence in the record.  Id. (quoting Murray v. Heckler,

5    722 F.2d 499, 502 (9th Cir. 1983)).

6         After reviewing the record, the Court finds that the ALJ appropriately credited Dr.

7    Mahon's opinion and met his burden in rejecting Dr. Peterson's October 2003 checklist

8    assessment that Plaintiff could only sit, lift, stand, carry, and walk for less than one hour each

9    in an eight-hour workday.  First, the ALJ provided specific and legitimate reasons grounded

10   in the record in rejecting Dr. Peterson's controverted findings.  Most notably, the ALJ

11   determined that Dr. Peterson's checklist assessment was "exaggerated" and "inconsistent

12   with the greater objective record, particularly with respect to the opinion of Dr. Mahon," and

13   appeared to be "motivated by a desire to help get the claimant benefits."  (AR 20).   In

14   reviewing the record as a whole, and recognizing the ALJ's duty to make credibility

15   determinations, the Court finds that the ALJ's determination on this point is supported by

16   substantial evidence.

17        The findings of Plaintiff's treating, examining, and nonexamining physicians,

18   including the findings of Dr. Peterson, are for the most part very similar, finding that Plaintiff

19   had degenerative disc disease with chronic lower back pain, neck pain, and difficulty in

20   controlling depression due to Plaintiff's bipolar and anxiety disorders.  Plaintiff's treating

21   physician, Dr. Mahon, and the State's two nonexamining physicians, found that Plaintiff's

22   mental and physical impairments did not prevent him from performing basic work tasks as

23   long as they involved few socially stressful demands and Plaintiff was able to intermittently

24   rest during an eight-hour workday.  It was only Dr. Peterson's checklist assessment that

25   differed, finding that Plaintiff was limited to three hours of activity in an eight-hour workday.

26   Dr. Peterson's checklist assessment of Plaintiff's functional ability does not contain an

27   explanation for the bases of his conclusions, and is thus entitled to little weight in light of the

28   other physicians opinions and the record as whole.  See, e.g., Boller, 2008 WL 268970, at

*8.  In addition, Dr. Peterson's assessment that Plaintiff was moderately severely limited by fatigue and pain states that it was based on Plaintiff's MRI.  However, Plaintiff's MRI was ordered and originally assessed by Dr. Mahon, and thus Dr. Peterson's summary conclusion concerning Plaintiff's functional limitations on that basis provides sufficient support for the ALJ to conclude that it does not constitute an independent finding.  As such, the Court finds that the ALJ did not act unreasonably in rejecting Dr. Peterson's assessment.

Dr. Peterson's limitation of Plaintiff's functional abilities is contradicted by the objective evidence in the record, including the opinions of Plaintiff's other treating physician, Dr. Mahon, and the examining physicians, as well as Plaintiff's stated daily activities.  Thus, the Court finds that the ALJ met his burden in providing specific and legitimate reasons that are supported by the record in rejecting the significant limitations suggested by Plaintiff's physician, Dr. Peterson.

In addition, Plaintiff contends that Dr. Mahon's opinion that Plaintiff needed an hour break after four hours of work and needed to rest for ten minutes after every two hours of work does not support the ALJ's conclusion that Plaintiff could perform his past relevant sedentary work as a receptionist or date entry clerk because SSR 96-9p states that "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."  Plaintiff states that the restriction of an hour break after four hours of work precludes Plaintiff from engaging in full-time work because a normal lunch break does not total one hour.[2]  However, there is no indication that Plaintiff would not be afforded an hour lunch period.  SSR 96-9p merely

---

[2]Plaintiff cites the Court to the federally mandated minimum lunch period, as well as the mandated minimum lunch periods in 17 states, which are generally between 30 and 45 minutes, as opposed to a full hour.  (Dkt. #43, pp. 1-3).  Plaintiff also notes that Arizona does not have a mandated minimum lunch period.  (Id.).  However, the Court declines to infer from that information that Plaintiff would not be afforded an hour lunch break, and thus given Dr. Mahon's limitation, would not be able to perform his past relevant work to the degree required under SSR 96-9p.

1    states that an individual must be able to sit for approximately 6 hours out of an 8-hour

2    workday.  The ALJ appropriately found that Dr. Mahon's opinion was consistent with SSR

3    96-9p and supported the conclusion that Plaintiff could perform his past relevant work

4    without specific limitations because the limitations specified by Dr. Mahon did not place

5    additional restrictions on Plaintiff's past relevant work.

6         Also, in rejecting Dr. Peterson's findings, the ALJ afforded weight to the opinion of

7    the State's two non-examining physicians, Drs. Tangeman and Nathan, who found no such

8    significant limitations regarding Plaintiff's ability to perform basic work tasks. (AR 20).  See

9    Morgan v. Apfel, 169 F.3d 595, 602 (9th Cir.1999) (stating that "rejection of opinion of a

10   treating or examining physician [may] be based, *in part*, on the testimony of a nontreating,

11   nonexamining physician.") (emphasis original).  The Court notes that the State's examining

12   physicians opinions were primarily based on Plaintiff's mental impairments, not Plaintiff's

13   physical impairments.  As such, to the extent that Plaintiff contends the ALJ ignored or

14   misstated the record with regards to the severity of Plaintiff's mental impairments and their

15   impact on Plaintiff's ability to perform his past relevant work (Dkt. #43, pp. 4-6), the Court

16   finds that the ALJ appropriately credited the opinions the State agency's reviewing

17   physicians with respect to the effect of Plaintiff's mental impairments. (AR 20).  The Court

18   notes that there were no other specific opinions regarding Plaintiff's mental impairments and

19   their effect on Plaintiff's ability to perform his past relevant work; and although the record

20   clearly indicates that Plaintiff suffers from bipolar and anxiety disorders, the record indicates

21   that Plaintiff was predominantly assessed as "mildly" mentally ill, with an average GAF

22   score that generally ranged between 50 and 68.  Further, Plaintiff's most recent mental health

23   diagnoses in 2004 indicated that Plaintiff's mental health appeared to be improving.  (AR

24   464).  As such, the Court finds that the record does not establish any basis to overturn the

25   ALJ's reliance on the State agency's reviewing physicians with regards to their analysis of

26   Plaintiff's mental health impairments and their relation to Plaintiff's residual functional

27   capacity.

28

**B.     Rejection of Plaintiff's Credibility**

Plaintiff contends that the ALJ committed error in rejecting his testimony regarding the severity of his symptoms, such as his pain level, and its impact on his functional abilities. However, "[a]n ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted). Nonetheless, "if there is medical evidence establishing an objective basis for some degree of pain and related symptoms, and no evidence affirmatively suggesting that the claimant was malingering, the [ALJ]'s reason for rejecting the [plaintiff's] testimony must be clear and convincing and supported by specific findings." Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). General findings are insufficient, rather the ALJ must identify what evidence is not credible and what evidence undermines the claimant's complaints. Id. In the instant case, there is no issue with the underlying impairments or the lack of evidence of Plaintiff's symptoms or pain, rather the issue centers on whether the ALJ provided the requisite reasons supported by the evidence to reject Plaintiff's credibility regarding the severity of his symptoms.

In reviewing the record on this point, the Court finds that the ALJ properly considered relevant factors in reaching his credibility determination. See Magallenes, 881 F.2d at 750 (stating that "the ALJ is responsible for determining credibility and resolving conflicts in medical testimony."). For instance, the ALJ cited multiple relevant factors recognized by the Ninth Circuit in discounting Plaintiff's testimony as to the severity of his symptoms. See Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991) (noting that relevant factors include the nature, duration, location, onset, and intensity of pain, functional restrictions and claimant's daily activities); see also SSR 96-7. The ALJ stated that despite Plaintiff's allegations that he could sit and stand for no more than 45 minutes, and could walk for not more than 30 minutes, the objective medical record indicated otherwise. (AR 19). As noted above in discussing the opinions of Plaintiff's physicians, such limitations are simply not supported by the medical record. In addition, the ALJ cited Plaintiff's testimony that he lives independently, drives, shops, and prepares his own meals, does his own laundry at his

1    parents' house, sometimes goes to the thrift store every day with his aunt, and regularly

2    walks to the mall for exercise.  (Id.); see Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.

3    1991) (stating that the ALJ was entitled to contrast Plaintiff's daily activities with her

4    testimony).  While Plaintiff clearly disagrees with the ALJ's determination, the Court's

5    review is limited to whether the ALJ provided the requisite reasons to support his adverse

6    credibility determination.  As such, in reviewing the cited bases for the ALJ's determination,

7    the Court finds that the ALJ's credibility analysis was supported by substantial evidence and

8    free of legal error.

9                    C.    The ALJ's Hypothetical to the Vocational Expert

10           Plaintiff contends that the hypothetical posed to the vocational expert was improper

11   in light of the ALJ's reliance on Dr. Mahon's opinion that Plaintiff could only work an eight-

12   hour day if he had an hour break after four hours of work and ten minute breaks every two

13   hours. (Dkt. #43, p.8); see Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999) (stating that

14   the ALJ's depiction of limitations in a posed hypothetical to a vocational expert are required

15   to be accurate, detailed and supported by medical evidence).  Specifically, Plaintiff objects

16   to the ALJ's use of a hypothetical individual that "could only sit, stand and/or walk six hours

17   out of an eight hour day."  (AR 668).

18           The Court initially notes, as stated above, that it is not error for the ALJ to rely on a

19   non-examining physician when his or her findings are supported by independent medical

20   evidence in the record.  In this case, the ALJ relied on the opinions of the State agency's

21   reviewing physicians, as well as Dr. Mahon's opinion and assessed limitations.  (AR 20).

22   The Court finds that the ALJ's hypothetical appropriately depicted the limitations imposed

23   by Dr. Mahon and the objective evidence in the record.  Dr. Mahon's statement that Plaintiff

24   needed an hour break after four hours of work, and that Plaintiff needed ten minute breaks

25   after every two hours of work, does not run contrary to the hypothetical of an individual who

26   "could only sit, stand and/or walk six hours out of an eight hour day."  Indeed, Dr. Mahon's

27   limitations are consistent with this statement and the other specific limitations referenced by

28   the hypothetical that the ALJ posed to the vocational expert.  Despite Plaintiff's apparent

1  contention, the ALJ did not need to recite Dr. Mahon's specific words in the hypothetical;

2  the ALJ appropriately incorporated the limitations on Plaintiff's functional abilities as

3  indicated by Dr. Mahon's opinion and the record as whole.  As such, the Court finds no error

4  based on the hypothetical posed to the vocational expert.

5  **V.    SUMMARY**

6          The Court finds that the ALJ did not improperly resolve the conflicts in the medical

7  testimony and evidence by rejecting Dr. Peterson's checklist assessment and Plaintiff's

8  testimony regarding the severity of his symptoms.  The ALJ made the necessary credibility

9  determinations and provided specific and legitimate reasons that appear to be supported by

10  substantial evidence in the record.  In addition, the Court finds that the hypothetical posed

11  to the vocational expert was consistent with Dr. Mahon's opinion.  The ALJ properly relied

12  on the findings of Plaintiff's treating physician, Dr. Mahon, the State's reviewing physicians,

13  and the testimony of the vocational expert, to find that although Plaintiff's impairments were

14  severe, Plaintiff's residual functional capacity did not prevent him from performing his past

15  relevant work.  Thus, based on a review of all the facts and the record presented, the Court

16  finds that there is substantial evidence to support the ALJ's decision.

17          **Accordingly,**

18          **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment is

19  DENIED.  (Dkt. #23).

20          **IT IS FURTHER ORDERED** that Defendant's cross-motion for summary judgment

21  is GRANTED.  (Dkt. #35).

22          **IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter

23  judgment accordingly.

24          DATED this 31st day of March, 2008.

25

26

27  _____
    Mary H. Murguia
28  United States District Judge